UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALEXANDER JAVIER JASSO,

  Petitioner,

  v.

GREG LEWIS,

  Respondent.

Case No.  14-cv-00802-JD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted.  Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the Court.  Petitioner filed a traverse.  The petition is denied.

### BACKGROUND

A jury found petitioner guilty of attempted first degree murder, assault with a semiautomatic firearm, willfully shooting at an occupied building, and gang-related street terrorism.  *People v. Jasso*, 211 Cal. App. 4th 1354, 1356 (Cal. Ct. App. 2012).  The jury found that petitioner attempted to murder Alejandro Múñoz, but acquitted him of attempted first degree murder of Rafael Múñoz Flores.  *Id*.  The jury also found true various enhancements that petitioner committed the offenses for the benefit of a street gang.  *Id*.  The California Court of Appeal affirmed the judgment in a published opinion.  *Id*. at 1378.  The California Supreme Court denied a petition for review.  Resp. Exs. G, H.

The California Court of Appeal summarized the facts of the crime as follows:

> I. Prosecution Case
> The prosecution presented the following facts at trial.  On the night of March 29, 2009, defendant, accompanied by his girlfriend Tara Meehan and his friend Robert Hornbeak, drove to a McDonald's restaurant in the Monterey County town of Prunedale.  Defendant

United States District Court
Northern District of California

looked toward the well-lit interior of the restaurant and saw Múñoz and his brother Flores. Defendant was a member of the Norteño criminal street gang and recognized Múñoz as a member of the Sureño criminal street gang. He recognized Múñoz personally; in addition, Múñoz was wearing a blue sweatshirt, and blue is a color that Sureño gang members use to identify themselves.

Defendant reacted negatively to Múñoz's presence. Hornbeak wanted him to ignore Múñoz and let the car's occupants get something to eat elsewhere, but defendant, according to Hornbeak's testimony, said, "I'm gonna get this fool" or "I gotta get this guy." Defendant maneuvered his large vehicle out of the restaurant's drive-through lane, circled around in the parking lot, and parked by one of the restaurant's windows. He racked the slide of a gun he had in the car and fired one shot. It passed through the restaurant window, causing Múñoz, Flores, and a woman identified in court as Jane Doe to duck or drop to the floor. The restaurant manager, who was Múñoz's wife, called 9–1–1. She would later identify defendant as the vehicle driver in a photographic lineup and in court. Sheriff's deputies arrested defendant at his residence. On the premises they found a gun, which was hidden in defendant's bedroom. The deputies also found a quantity of ammunition in the bedroom. They did not find defendant's vehicle on the premises, but found it a few days later on property on which a friend lived. It was "away from everything, out of sight" behind a tree and concealed by a tarpaulin and plywood sheets.

A criminalist who testified as an expert on firearms answered yes to the prosecutor's question whether the bullet recovered from the crime scene was in "very poor condition." The authorities did not attempt to match it to defendant's gun. The expert testified that the gun could not be fired until its slide had been pulled back to chamber a round. Because of a missing part, the gun could be fired with about one-third of the normal trigger pulling force needed. The "harder trigger pull [is] a safety measure," he explained, but this gun lacked the needed part. As a result, some 4.25 to 4.5 pounds per square inch of pulling force would discharge the weapon, whereas ordinarily about 12 pounds per square inch would be required. In general, however, the gun worked normally, and it was of "reasonably high quality.

Because defendant was the subject of a gang-related charge and numerous gang-related allegations, the prosecution presented evidence of his ties to the Norteño gang. A witness qualified as an expert in street gangs generally and the Norteños in particular testified that gangs like the Norteños have an honor-based culture and thus prize displays of dominance over other similar gangs and, conversely, take harshly to insults or other acts that they perceive as demeaning to them. The Norteños' archrival is the Sureño criminal street gang. The Norteños use certain motifs to identify and promote the gang. These include the number 14, the color red, the logos of the San Francisco Giants professional baseball team, and the iconic huelga eagle that is the symbol of the United Farm Workers agricultural labor union. (Huelga is Spanish for a labor strike.) Norteños also use tattoos and hand gestures to identify themselves and to intimidate or ward off other gangs.

Defendant bore a one-dot tattoo on one arm and a four-dot tattoo on the other, registering his identification with the Norteños' favored number 14 (the letter "N" is the fourteenth letter of the alphabet). In

his bedroom sheriff's deputies found a red blanket with the logo of the San Francisco 49ers professional football team, red bandanas, a T-shirt with the huelga eagle, and CD–ROM covers with the title "Northern Cali Killas" (Cali being an abbreviation of California), and a man in red holding an Uzi machine gun. A cap modeled on the uniform of the New York Yankees professional baseball team was red instead of the Yankees' traditional blue. A San Francisco Giants cap was white with red letters instead of the Giants' traditional black and orange. Hornbeak testified that he was making prideful Norteño gestures to Múñoz and Flores before defendant fired his shot, and that Múñoz and Flores were laughing at Hornbeak for doing so.

Inside defendant's vehicle, sheriff's deputies found CD–ROM covers with the words "Northern Exposure," the huelga eagle, and one dot followed by four dots. According to the testimony of a sheriff's department detective, the CD–ROMs featured the performances of gang-associated musicians who performed music listened to by Norteño gang members. The friend who was hiding defendant's vehicle for him was dressed in a red shirt and red tennis shoes with red shoelaces when the deputies went to the property. The same detective testified that as he prepared to book defendant into jail, defendant "told me he was a Norteño" for the jail's housing assignment purposes.

The prosecution's expert witness on gangs testified that in his opinion defendant was an active member of the Norteños. The witness testified that defendant, despite his youth, had a long history of associating with the Norteños in various parts of California and that he was an active Norteño on the day of the crimes. He also testified that defendant fired the shot in the direction of Múñoz and Flores to promote the Norteños' interests.

Questioned by sheriff's investigators following his arrest, in an interview that was recorded and played for the jury, defendant acknowledged that his gun discharged toward Múñoz and Flores, but insisted that he fired it "accidentally" and did not intend to shoot at anyone. He claimed that he did not rack the gun's slide to load a round into the chamber for firing. Defendant was acquainted with Múñoz and did not like him but "wanted [only] to fight him ... [and] not shoot him" after seeing him at the restaurant. He denied making any gang gestures toward Múñoz and Flores.

II. Defense Case

The defense presented the following facts at trial, at which defendant testified on his own behalf.

Before defendant shot at Múñoz, the two exchanged insults outside the restaurant, although they were not gang-related. Nor did the two exchange gang signals. However, defendant knew that "they called him [Múñoz] a southerner," meaning a member of the archrival Sureño street gang. Defendant parked his vehicle and could see Múñoz, who was now inside the restaurant. Defendant and Hornbeak, still in defendant's vehicle, gestured to Múñoz to come outside, and Múñoz, who was seated and talking on a telephone, started laughing at defendant. "I got kind of mad," defendant testified, and so, in what was "the worst mistake of my life," "I got the weapon" "to show it to him," meaning Múñoz. Defendant did this to "kind of fit in, to look tough." "It went off," defendant testified, but "I never meant for a bullet to be fired from that weapon." "If I wanted to kill him, I could have kept shooting."

Defendant did not pull back the gun slide to chamber a round, so Hornbeak—who said he heard a semiautomatic gun being cocked from the area of the driver's seat—must have misinterpreted the sound. Nor did defendant tell Hornbeak that he intended to "get this guy," in the words of the prosecutor during cross-examination.

The reason defendant took his vehicle to another location, some three to four days later, was to have his friend's father fix a damaged bumper.

Defendant admitted to being a Norteño gang member "[a]t one point" and retaining a degree of interest in the Norteños' lifestyle and imagery, as shown by the paraphernalia found at his residence and in his car (although he associated the huelga eagle with the late César Estrada Chávez, the well-known labor leader who co-founded the United Farm Workers union, rather than with the Norteños); he had called himself a Norteño earlier in his life. But he denied being actively involved with any gang after "maybe [age] 17 at the latest." FN4 For example, he acquired his Norteño dot tattoos at age 14, and only to be "cool." Even when he considered himself an active Norteño, his activities consisted of "just girls, weed, and partying," but not gang-related crimes. He might own more blue clothing than red and in general he had "real plain tastes, so I'm used to wearing ... black shirts or white shirts and just regular jeans." He also denied identifying himself as a Norteño during his jail booking. Instead, he had requested to be placed with the general population and not with the separate housing set aside for Norteños. In addition, he admitted to having juvenile delinquency adjudications and juvenile probation violations, and he acknowledged that a juvenile court judge had once imposed a gang-related probation condition "telling me that I had to stop hanging around with the group of friends that I [had]."

> FN4. Defendant was 18 years old when he fired the shot into the restaurant.

Defendant did not consider his friend Hornbeak to be a Norteño, but he knew, and for a while had associated with, at least five people in Monterey County whom he considered to be gang members or probable gang members. He obtained his gun in Visalia (Tulare County) "for protection" and ammunition for it because he had once been shot at in Prunedale and, regarding the gun itself, because "I thought it was cool" to have it.

Defendant was evasive in answering his lawyer's question whether his being fired upon had happened only shortly before his own gunplay at the restaurant, but he admitted that "it wasn't that long" beforehand. He further testified on direct examination that he told the sheriff's department detective who questioned him that he and the victim were rival gang members, and in his testimony he implied that he believed the victim was a Sureño: "I have some friends that ... live by him, so they know him real well" and "[t]hey said that he might be a southerner." He amplified that he and the victim "just didn't like each other," and this was so "because a friend of mine that lives right next to him ... has problems with him." He also testified that he had fired the gun before the fateful encounter at the restaurant and that it had not discharged accidentally before.

Hornbeak testified that he and defendant went to a residence after the shooting. Defendant handed him the gun but it started to fall from Hornbeak's grasp. Hornbeak squeezed the trigger inadvertently and the gun discharged. Hornbeak did not testify about the amount of gripping strength it took for this accident to

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

happen.

*Jasso*, 211 Cal. App. 4th at 1357-61.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the

1    burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

2          The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

3    state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

4    1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court to

5    consider the petitioner's claims, the court looks to the last reasoned opinion.  *See Nunnemaker* at

6    801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

### DISCUSSION

8          As grounds for federal habeas relief, petitioner asserts that: (1) his right to due process was

9    violated when the prosecutor engaged in misconduct; and (2) there was insufficient evidence to

10   support the gang enhancement findings.

## I.     PROSECUTORIAL MISCONDUCT

12         Petitioner argues that the prosecutor committed misconduct in closing argument by: (1)

13   asserting that California higher courts had found defendants guilty under similar facts; (2) shifting

14   the burden of proof to petitioner to prove that the gun fired accidentally; and (3) alleging that

15   petitioner fabricated the claim that the gun fired accidentally after speaking with his attorney and

16   incorrectly stating that petitioner never told police the shooting was accidental when petitioner did

17   make such a statement.

### Legal Standard

21         Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard

22   of review is the narrow one of due process and not the broad exercise of supervisory power.

23   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated

24   when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id*.; *Smith v. Phillips*, 455

25   U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial

26   misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the

27   first issue is whether the prosecutor's remarks were improper; if so, the next question is whether

28   such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir.

United States District Court
Northern District of California

2005).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

Factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.  Moreover, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

**A.**     **Court Decisions Supporting Petitioner's Guilt**

**1.**     **Background**

During closing argument the prosecutor stated to the jury:

> The Defendant shot a gun at human beings who were in an occupied McDonald's restaurant.  The shooting alone, by itself, clearly proves the intent to kill [the victims].  Just that shooting alone.  I'm not just saying that, the California Supreme Court says this.  It says that the act of purposely firing a gun at another human being, at close range, provides the inference that the shooter acted with the intent to kill.  The shooting alone proves the Defendant's intent.  That's it.  [¶] The Defendant's shooting into an occupied McDonald's at [the victims] proves his intent, proves that he wanted to kill [the victims].

United States District Court
Northern District of California

1   Reporter's Transcript ("RT") at 2737-38.  Later the prosecutor argued:

2          [H]e pulled that trigger while that gun was pointed at [the victims].
           That proves intent to kill.

3          One shot, two victims, equals attempted murder.  Based on the
           evidence that we had, that is enough.  One shot, two victims, that's

4          attempted murder for both those victims.  [The] Supreme Court said,
           intent to kill two different victims can be inferred from evidence that
           the Defendant fired a single shot at the two victims, both of whom

5          were visible to the Defendant.  That's what we have here.
           Another, appellate--California appellate court said: Defendant's act

6          of firing a .22 caliber rifle, toward a victim, from approximately 20
           yards away, and in a manner that could have inflicted a mortal

7          wound, had the bullet been on target, was sufficient to support an
           inference of intent to kill.  The fact that the defendant was

8          unsuccessful in killing the victim, or abandoned his efforts after one
           shot, did not mean that he lacked the requisite intent.  Kind of sums

9          it up right there.

10  RT at 2740.

11         Petitioner's trial counsel objected during a break in the prosecutor's argument and moved

12  for a mistrial.  RT at 2766-67.  The trial court noted the problem with the argument stating, "the

13  Court's opinion of that has always been that those are the type of discussions that should take

14  place at the time of instructions."  RT at 2767.  However, the trial court held that while the

15  prosecutor's remarks were novel they did not warrant a mistrial.  RT at 2767-68.

16         **2.      Discussion**

17         The California Court of Appeal noted the unique nature of the claim and after discussing

18  state law at length found the prosecutor had erred:

19         The parties did not cite any case, and we have found almost no case
           anywhere in the United States, that directly and substantively

20         addresses the type of remarks the prosecutor made to the jury.
           . . .

21         Defendant here argues that the prosecutor "improperly inject[ed]
           additional facts purportedly within his knowledge into the case, and

22         usurp[ed] the court's function to instruct the jury on the law, and the
           jury's function to apply that law to the facts it determined."  He is

23         correct that the remarks ran the risk of committing the usurpation he
           discerns.  The California Supreme Court and the California Court of

24         Appeal are, respectively, the highest and second-highest echelons of
           the state court system.  The prosecutor erred in invoking their

25         authority. He should not have invoked the authority of any court that
           one or more jurors could surmise outranks the trial court.  A fortiori,

26         he should not have implied that the California Supreme Court would
           expect the jury to return a guilty verdict.  This he did when he said:

27         "The shooting alone, by itself, clearly proves the intent to kill [the
           victims].  Just that shooting alone.  I'm not just saying that, the

28         California Supreme Court says this.  It says that the act of purposely
           firing a gun at another human being, at close range, provides the

United States District Court
Northern District of California

8

inference that the shooter acted with the intent to kill.  The shooting alone proves the Defendant's intent.  That's it."

Although, as noted, we have found scant authority on this matter, we regard this problem as similar to the misconduct disapproved in *Caldwell v. Mississippi* (1985) 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (*Caldwell*).  In *Caldwell*, "a prosecutor urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court." (*Id.* at p. 323, 105 S.Ct. 2633.)  The prosecutor told the jury that "'your decision is not the final decision'" (*id.* at p. 325, 105 S.Ct. 2633) because it "'is automatically reviewable by the [Mississippi] Supreme Court'" (*id.* at pp. 325–326, 105 S.Ct. 2633).  *Caldwell* held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at pp. 328–329, 105 S.Ct. 2633.)

In sum, "*Caldwell* error occurs ... when the remarks to the jury concerning its role in the sentencing process are inaccurate or misleading in a way that allows the jury to feel less responsible than it should for the sentencing decision." (*People v. Elliott* (2012) 53 Cal.4th 535, 556, 137 Cal.Rptr.3d 59, 269 P.3d 494.)  Our own Supreme Court reached the same conclusion many years before *Caldwell*.  In a case that also considered capital jury sentencing verdict issues, the court stated that "argument misinform[ing] the jury as to the power of this court" (*People v. Morse* (1964) 60 Cal.2d 631, 650, 36 Cal.Rptr. 201, 388 P.2d 33, italics deleted) presents the risk that jurors would believe the high court "could substitute its judgment" (*ibid*.) for the jury's.

In this case, the risk is rather that jurors might believe the high court had already done the jury's work and made the jury's choice for it.  Their commonality lies in the risk of telling the jury that its role is less significant than it is: in *Caldwell* because the Mississippi Supreme Court would reassess any decision the jury made to impose a death sentence, and here because the California Supreme Court or the California Court of Appeal would expect the jury to find defendant guilty under the facts the prosecution had presented.

*Caldwell*'s holding was narrow inasmuch as the court's analysis rested on Eighth Amendment considerations that apply to the death penalty.  (*See Caldwell*, *supra*, 472 U.S. at pp. 329–330, 105 S.Ct. 2633.)  The same may also be true of *People v. Morse*, *supra*, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33.  Nevertheless, along with the main parallel between those cases and this one, other observations that the Caldwell court made also apply to the situation before us.

*Caldwell* mentioned the obvious: "jurors often might not understand" "the institutional limits on what an appellate court can do." (*Caldwell*, *supra*, 472 U.S. at p. 330, 105 S.Ct. 2633.)  The jurors here may have thought that appellate courts are allowed to reverse jury verdicts of acquittal or are allowed to send messages telling juries what to do in particular cases.

Caldwell identified another risk: that a jury "might ... wish to 'send a message' of extreme disapproval for the defendant's acts." (*Caldwell*, *supra*, 472 U.S. at p. 331, 105 S.Ct. 2633.)  Again, *Caldwell* had in mind the decision whether to impose a death

sentence, but the point remains valid in any case in which prosecutorial remarks create a risk that the jury will conclude that a high court is assuming some responsibility for the jury's decision. A witness testified in this case that there were some 6,000 Norteños in Monterey County and "in the neighborhood of" 120,000 Norteños or Norteño associates in northern California. Those are alarming and probably surprising statistics, which the witness soon followed by explaining that the Norteños' crimes include "robbery, carjacking, murder, weapons [possession], narcotic sales, identity theft, [and] kidnapping." Such dramatic testimony could help nudge jurors toward embracing the prosecutor's argument for convicting defendant even if they had misgivings about the state of the evidence, if they felt that the verdicts to be rendered had already been settled to some extent by the California Supreme Court or Court of Appeal.

The foregoing risk was made all the greater by the prosecutor's remark, in effect, that the state was just going through the motions in trying defendant because the case against him was so strong. He said, "We are here because the Defendant has this right to this process. And it's a right that everybody in this country has, and it's a right that should never be given up. And that is the only reason we are here, because he has this right." He reiterated shortly after the foregoing remark that "the only reason he was here [sic], is just because the Defendant has this right. The Defendant also has a right to an attorney.... [Defense counsel] is a very good attorney, and he's done the best he can ... with this case. But the fact is, you're only as good as your case. I even admit that as a prosecutor, we're only as good as the facts that we have. This was a very good case. We had a lot of evidence."

Still another risk *Caldwell* identified is that a "capital sentencing jury"—but this may be said of many juries considering serious felony charges—"is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die"—or, as in this case, another's penal fate short of a death sentence—"and they are asked to decide that issue on behalf of the community.... [¶] This problem is especially serious when the jury is told that the alternative decision-makers are the justices of the state supreme court. It is certainly plausible to believe that many jurors will be tempted to view these respected legal authorities as having more of a 'right' to make such an important decision than has the jury." (*Caldwell*, *supra*, 472 U.S. at p. 333, 105 S.Ct. 2633.) Little more need be added to this observation except that the prosecutor's remarks about the California Supreme Court and Court of Appeal created similar risks here.

In one respect, the prosecutor's remarks posed a greater risk than did the remarks that *People v. Morse*, *supra*, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33, disapproved. In *Morse*, the court could take comfort in its reflection that "[w]ords of instruction of the trial judge are more likely to effect prejudice than the words of argument of the prosecutor." (*Id.* at p. 650, 36 Cal.Rptr. 201, 388 P.2d 33; *see also*, *e.g.*, *People v. Thornton* (2007) 41 Cal.4th 391, 441, 61 Cal.Rptr.3d 461, 161 P.3d 3.) But that axiom can be carried only so far and remain meaningful. If one or more jurors knew that the California Supreme Court and Court of Appeal outrank the trial court, that

10

axiom would lose its vigor, because they might understand the prosecutor's argument as inviting them to follow higher authority, as he interprets it, rather than the trial court's instructions.

In sum, invoking the authority of the higher courts as the prosecutor did constituted error.

*Jasso*, at 1364-69.

After concluding that the prosecutor's statements constituted error, the California Court of Appeal held that the error was harmless:

> As stated, the prosecutor committed misconduct in arguing that the California Supreme Court and the California Court of Appeal had affirmed convictions on facts similar to those of this case . . . . The prosecutor's actions were, however, harmless under any standard—under that of *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17 L.Ed.2d 705, applying to infringement of federal constitutional guaranties, and which requires that the state show that the error was harmless beyond a reasonable doubt, and that of *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243, applying to errors under state law, in which a defendant must show that there is a reasonable probability that, but for the asserted error, the outcome would have been more favorable to him or her. The case against defendant was strong. There was no obvious reason for defendant to fire a gunshot at another person merely because that individual and a neighbor whom defendant knew did not get along. Rather, the evidence was that defendant, a Norteño street gang member, knew that Múñoz, one of the three victims, was a rival Sureño street gang member. Defendant told his passengers that he was going to confront Múñoz. Instead of entering the restaurant to fight Múñoz, as defendant's self-serving statements about intent would have it, defendant parked his car, looked through the restaurant window at Múñoz and his brother Flores, and fired a round with sufficient accuracy that it penetrated the window, although it failed to wound either man.
>
> The prosecutor's references to higher courts ran the risk of being perceived as conveying instructions that conflicted with those given by the trial court. This possibility requires us to consider defendant's claim, at least in passing, as one of instructional error, even though the objectionable words came from the prosecutor and not the trial court.
>
> We recognize that there was at one time, and may still exist, a view that even strong evidence can seldom overcome certain types of instructional error for purposes of prejudice analysis—at least those that "effectively prevent the jury from finding that the prosecution failed to prove a particular element of the crime beyond a reasonable doubt." (*People v. Flood* (1998) 18 Cal.4th 470, 491, 76 Cal.Rptr.2d 180, 957 P.2d 869.) Doing so would mean that the reviewing court, not the jury, was assessing the facts of the case and, in effect, improperly trying the defendant, thereby violating the defendant's Sixth Amendment right to jury trial. (*People v. Hagen* (1998) 19 Cal.4th 652, 682, 80 Cal.Rptr.2d 24, 967 P.2d 563 (conc. and dis. opn. of Kennard, J.); *People v. Concha* (2010) 182 Cal.App.4th 1072, 1086, fn. 9, 107 Cal.Rptr.3d 272.)
>
> If we evaluate defendant's claim through the prism of instructional error, we must still find the error harmless, because the California

Supreme Court has held that, under United States Supreme Court precedent, sufficiently strong evidence may overcome the aforementioned types of instructional errors for purposes of prejudice analysis. (*Flood*, *supra*, at pp. 497–503, 76 Cal.Rptr.2d 180, 957 P.2d 869; *see Concha*, *supra*, at pp. 1085–1086, 107 Cal.Rptr.3d 272.) Thus, the prosecutor's action in referring to the higher courts of California was harmless under *Chapman*, *Watson*, or *Flood*.

*Jasso*, at 1372-73.

In *Davis v. Ayala*, 135 S. Ct. 2187 (2015), the Supreme Court recently clarified the standard to be used on habeas review of a state court's harmlessness analysis. If a state court finds an error harmless, that determination is reviewed under the deferential AEDPA standard. This means that relief is not available for the error "unless the state court's harmlessness determination itself was unreasonable." *Davis*, 135 S. Ct. at 2199 (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." *Id*. (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). And if the federal court determines that the state court's harmless error analysis was objectively unreasonable, it also must find that the error was prejudicial under *Brecht* before it can grant relief. *See Fry*, 551 U.S. at 119-20 (§ 2254(d)(1) did not displace *Brecht*).

The Ninth Circuit recently addressed the issue of prosecutorial misconduct on habeas review in *Deck v. Jenkins*, 768 F.3d 1015 (9th Cir. 2014). In *Deck*, the petitioner challenged a conviction of an attempted lewd act upon a child for which he had been arrested in a sting operation when he arrived at a location to meet an underage girl with whom he believed he had been exchanging online message when in fact he had been communicating with law enforcement. *Id*. at 1018-19. During closing argument the prosecutor stated that he did not have to prove that petitioner was going to commit a lewd act on the day he was arrested, rather even if he was just meeting the child to "break the ice" and follow up next week, or in two weekends or at some point in the future to commit a lewd act, then he was guilty. *Id*. at 1019. The California Court of Appeal found that the prosecutor committed misconduct by misstating the law, but that the misconduct was not prejudicial and denied relief. *Id*. at 1020-21. The district court denied

United States District Court
Northern District of California

1    petitioner's habeas petition, but the Ninth Circuit reversed.  The Ninth Circuit found that the

2    argument that petitioner lacked the intent to commit a lewd act during the first meeting was central

3    to his defense, and petitioner was prejudiced when the prosecutor made his improper arguments

4    concerning the law.  The Ninth Circuit also noted that the evidence of petitioner's temporal intent

5    to commit the crime was not overwhelming and the trial court did not correct the prosecutor's

6    misstatement.  *Id*. at 1027, 1029.  While the jury asked a question related to this issue, no answer

7    was provided because a juror was excused for sickness requiring the jury to restart deliberations

8    from the beginning.  *Id*.  All of these factors and especially the jury request for clarification that

9    went unanswered left the Ninth Circuit with "grave doubt" regarding the prosecutor's comments

10   and whether the error had a substantial and injurious effect or influence on the jury's verdict.  *Id*.

11   at 1031.

12         The Supreme Court's ruling in *Davi*s was issued after the Ninth Circuit's decision in *Deck*,

13   which used a slightly different standard.  This Court must review the state court's harmless error

14   determination under AEDPA and relief is not available for the error "unless the state court's

15   harmlessness determination itself was unreasonable."  *Davis*, 135 S. Ct. at 2199.  The California

16   Court of Appeal discussed the error and the overwhelming evidence presented against petitioner

17   and found the error harmless.  Petitioner is not entitled to habeas relief because the California

18   Court of Appeal's harmlessness determination was not unreasonable.

19         There are some similarities between this case and *Deck* that raise concern regarding

20   petitioner's conviction.  In both cases the state courts found that the prosecutor committed

21   misconduct in closing argument, and the improper statements concerned a key aspect of the

22   petitioner's defense.  In *Deck*, the Ninth Circuit was particularly concerned with a jury question

23   that the trial court did not answer regarding the disputed issue.

24         In this case during deliberations, the jury asked, "Please clarify-does the act of firing a

25   weapon in the direction of a person constitute 'intent to kill' under the law.  Please define 'intent

26   to kill.'"  Clerk's Transcript ("CT") at 445.  The trial court responded, "For counts 1 & 2, PC

27   664/187 the intent requirement for defendant is a specific intent to kill & the jury must decide the

28   factual issues surrounding the act(s) of defendant."  *Id*.  While the trial court in *Deck* did not

13

1    answer the jury's question, the trial court in this case was clear that the jury must decide the

2    factual issue of whether petitioner had the specific intent to kill.

3         In addition, the jury was properly instructed that nothing the attorneys say is evidence,

4    including closing argument.  CT at 450.  There are no allegations that the jury instructions

5    regarding attempted murder or the intent requirement were improper.  A review of these jury

6    instructions demonstrates that they were correct.  CT at 456, 470-71.  The jury is presumed to

7    follow the instructions given.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

8

9         The evidence against petitioner in this case was overwhelming which further undermines

10   his argument that the prosecutor's few statements had a substantial and injurious effect on the

11   verdict.  As discussed above, there was a great deal of evidence that petitioner was in a gang,

12   observed the victims who were in a rival gang, and brandished his gun and fired one shot at them.

13   Petitioner's own testimony corroborates much of the prosecution's case.  While petitioner denied

14   that he made gang gestures with his hands, he testified that he was waving his hand at the victims.

15   RT at 2177.  Petitioner stated he was waving his hand so that the victims would come outside and

16   then they could fight.  RT at 2178.  When the victims did not exit the restaurant, petitioner

17   testified that he became mad and retrieved the gun to show it to them and communicate that he

18   was not scared.  RT at 2180.  Petitioner testified it was at this time the gun accidentally went off.

19   *Id.*  Witnesses testified that the bullet hit the window of the restaurant.  RT at 989-90.  Plaintiff

20   also testified that he was involved with the gang from the ages of fourteen to seventeen, but not

21   when the incident occurred, when he was eighteen years old.  RT at 2202-03.  Petitioner also

22   testified that he believed that one of the victims was part of the rival gang.  RT at 2226.  Looking

23   at the overwhelming evidence presented against petitioner and at his own testimony, the Court is

24   not left with grave doubt that the prosecutor's statements affected the jury's verdict.

25        Based on the abundant evidence that petitioner intended to shoot at the victims for gang

26   reasons, that the jury was properly instructed, and that the trial court correctly and specifically

27   answered the jury's question, the Court finds that the state court's harmlessness determination was

28

United States District Court
Northern District of California

not unreasonable.[1]  This claim is denied.

### B.    Shifting Burden of Proof

#### i.    Background

During closing argument the prosecutor stated to the jury:

> Obviously, you know the defense.  It was just an accident.  I didn't mean to pull the trigger.  It was just an accident.  But when you start to go down the facts of everything that shows that he committed this crime, intentionally and personally.  All of the decisions that he made versus an accident, you can compare the evidence of what happened to what he said - - the accident - - all you're left with is his self-serving, incredible, unreliable, unbelievable statement.  That's it.  There's no other evidence.
> And when [defense counsel] gets up here and argues to you, you ask for him to fill in this part of it, ask for him to fill this in with the facts, with the evidence that proved that.  It's not there, based on all of the evidence that was presented there.

RT at 2758.

Petitioner's counsel moved for a mistrial and outside of the jury's presence, the trial court denied the motion stating, "The Court is confident that the instructions that have been read to the jury emphasize and repeat, on a number of occasions, the fact that the burden is solely with the Prosecution."  RT at 2766.

Later during his rebuttal argument the prosecutor again discussed petitioner's defense and stated, "We don't have any evidence showing that there's an accident.  There is no issue. . . . where is the evidence?  Where is the evidence for the column on the right-hand side[?]"  RT at 2795.  It appears that the prosecutor was referring to a display in the courtroom that summarized the evidence.  *Jasso*, at 1370.  Petitioner's counsel objected, and the trial court stated to the jury:

> The Court does want to, again, re-emphasize, as we have said

---

[1] The jury recessed to begin deliberations at 11:54 a.m. and were then excused for lunch.  CT at 273.  They returned with a verdict at 5:04 p.m.  *Id.*  The length of jury deliberation may be examined when assessing harmlessness.  "'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'"  *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) (quoting *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., Lopez*, at 846 (jury's deliberation for 2.5 hours on illegal reentry case suggested any error in allowing testimony or commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (jury deliberation for 4 days supported inference that impermissible evidence affected deliberations).

United States District Court
Northern District of California

throughout the trial, that the Prosecution has the burden of proving each and every element, in this particular case, which includes intent and all the other elements.  The Defense does not need to prove anything in this particular case.

RT at 2795.

Finally, petitioner's counsel objected unsuccessfully to the prosecutor's following statement:

Once again, if that evidence was there, if there actually was evidence of an accident, [defense counsel], as good an attorney as he is, would have presented it, but there is no evidence. . . . We [don't] hear any evidence that there was an accident, because it was not there, because it was not an accident.

RT at 2795-96.

### ii.   Discussion

The California Court of Appeal denied this claim:

This comment did not amount to prosecutorial misconduct.  There is "'[a] distinction ... between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.'" (*People v. Thomas* (2012) 54 Cal.4th 908, 939, 144 Cal.Rptr.3d 366, 281 P.3d 361.)   The former is permissible because a prosecutor generally is permitted to remark on the state of the evidence at closing argument.  (*E.g.*, *People v. Weaver* (2012) 53 Cal.4th 1056, 1077, 139 Cal.Rptr.3d 355, 273 P.3d 546.)  "[T]he prosecutor may comment '"on the state of the evidence, or on the failure of the defense to introduce material evidence or call logical witnesses...."'" (*People v. Carter*, *supra*, 36 Cal.4th at p. 1277, 32 Cal.Rptr.3d 838, 117 P.3d 544.)

Under these principles, the Supreme Court rejected a claim similar to defendant's, including a reference to blanks on a chart, in *People v. Redd* (2010) 48 Cal.4th 691, 108 Cal.Rptr.3d 192, 229 P.3d 101.  There, the prosecutor repeatedly challenged the basis for the defense theory.  He remarked: "'I have a blank paper because I'm not sure exactly what the defense is yet.  I'm going to sit here like you and listen to [defense counsel].  I don't know what he's going to say.'" (*Id.* at p. 739, 108 Cal.Rptr.3d 192, 229 P.3d 101.)  Later, the prosecutor jibed that he was "'waiting to hear what the defense was.'" (*Ibid.*)

*Redd* rejected a claim that the foregoing remarks shifted the burden of proof to the defendant.  "[T]he prosecutor's comments merely highlighted his observation that there seemed to be no coherent defense to the charges" (*People v. Redd*, *supra*, 48 Cal.4th at p. 740, 108 Cal.Rptr.3d 192, 229 P.3d 101), which, although *Redd* did not say so explicitly, was a permissible comment on the state of the evidence.

To be sure, the prosecutor's argument at one point that there was no evidence that defendant's discharge of the gun was accidental was belied by defendant's testimony and his statement to police, in which he maintained he did not intend to fire the gun.  But at the

16

outset the prosecutor acknowledged defendant's testimony that the shooting was accidental, while dismissing it as "self-serving, incredible, [and] unreliable." In our view, the prosecutor was arguing that there was no evidence of accident beyond defendant's self-serving statements, including the one that the prosecutor had acknowledged earlier in the argument. There was no misconduct under the circumstances as far as this claim is concerned.

*Jasso*, at 1370-71.

Petitioner has failed to demonstrate that the denial of this claim was an unreasonable application of Supreme Court authority. The prosecutor's statements were acceptable in light of petitioner's testimony that firing the gun at the victims was an accident. "A prosecutor may, consistent with due process, ask a jury to convict based on the defendant's failure to present evidence supporting the defense theory." *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005); *see also United States v. Garcia-Guizar*, 160 F.3d 511, 521–22 (9th Cir. 1998) (prosecutor did not shift the burden of proof in commenting on defendant's failure to produce evidence). Indeed, as the Ninth Circuit has recognized, "a prosecutor may comment on the absence of evidence even when such evidence was available, but inadmissible, so long as there is sufficient evidence to support the prosecutor's version of events." *Menendez*, 422 F.3d at 1034. A constitutional problem may arise if the comment is phrased so as to call attention to the petitioner's own failure to testify, *Garcia-Guizar*, 160 F.3d at 522, but that is not an issue here. "Since [petitioner] did in fact testify at trial, the prosecutor's comment cannot be said to have shifted the burden of proof." *Id*. Because petitioner testified at trial and the prosecutor was questioning petitioner's testimony and defense, there was no misconduct, and this claim is denied.

## C. Fabrication of Evidence after Speaking with Counsel and Prosecutor's Misstatement

The California Court of Appeal set forth the background and denied this claim:

Defendant's argument that the prosecutor implicitly accused defense counsel of helping defendant change his story in order to render a false account of events also does not rise to the level of prosecutorial misconduct. The prosecutor argued, over defendant's objection, that defendant "wouldn't tell [the authorities] where he got" the gun but then "his attorney comes forward and he says[,] Well, I'd better tell you, I got it from Casper...." He also argued, over defendant's objection, that "[w]e know it wasn't an accident." "[H]e gets up there and tells you on the stand" that he fired the weapon accidentally but "[n]ot once did he say to the police it was an accident. He doesn't say that once."

To the extent that the garbled reference to "Casper" communicated anything to the jury at all, the prosecutor was not accusing defense

17

counsel of encouraging defendant to make false statements, but rather was attempting to comment that defendant changed his story. The same is true of the prosecutor's statement that defendant's claim that he accidentally discharged the gun was a newfound assertion. "The prosecutor did not directly accuse defense counsel of encouraging defendant to lie, but even to the extent the statements swept counsel up in defendant's asserted lies, this was not an improper comment in the context of this case, in which defendant's story changed drastically during trial preparations." [Citations omitted.]

*Jasso*, at 1371-72.

The state court opinion was not objectively unreasonable. The state court noted that the prosecutor did not directly accuse trial counsel of encouraging petitioner to lie, rather it was noted that the story changed, which was an accurate reflection of the evidence. Even assuming that the prosecutor erred, petitioner has not shown that this minor statement had a substantial and injurious effect or influence in determining the jury's verdict.

Petitioner also argues that the prosecutor committed misconduct when he argued that petitioner never told police that the gun discharged by accident. The California Court of Appeal noted that this was prosecutorial misconduct because it was an erroneous description of the evidence. *Jasso*, at 1372. Petitioner did tell police in an interview that the gun fired accidentally. Petitioner testified at trial that he originally told the police he was not involved, but then told them repeatedly that it was an accident. RT at 2192-94. *Id.*

Despite being misconduct, this misstatement did not have a substantial and injurious effect on the jury's verdict. In closing argument, petitioner's trial counsel noted on several occasions that petitioner told the police officers it was an accident. RT at 2782-83. Petitioner's trial counsel stated to the jury, "[the prosecutor] says that nowhere did [petitioner] ever tell the officers that it went off accident[ally]. And you saw the video. [Petitioner] repeatedly says it was [an] accident. I didn't mean to do it. I didn't mean to do it. And he said it over and over again . . . ." RT at 2771.

The jury was also properly instructed that nothing the attorneys say is evidence, including closing argument. CT at 450. The jury is presumed to follow the instructions given. *Weeks*, 528 U.S. at 234. When the prosecutor made the misstatement, trial counsel objected, and the trial court stated to the jury, "Ladies and gentlemen, the objection will be noted. Again, you are the

18

United States District Court
Northern District of California

1   judges of the evidence and the evidence that's been presented." RT at 2746. The prosecutor's

2   isolated misstatement did not rise to a due process violation to warrant habeas relief, especially in

3   light of the evidence implicating petitioner. It was undisputed that the gun was fired towards the

4   victims while petitioner was holding it. There was also a great deal of evidence that petitioner

5   intended to fire at one of the victims because he was a rival gang member, and not that shooting

6   was an accident, as petitioner asserts. For all these reasons, this claim is denied.

7   **II.    SUFFICIENCY OF THE EVIDENCE**

8        Petitioner next contends that there was insufficient evidence to support the gang benefit

9   allegations and the separate conviction for criminal street gang terrorism.

10        **Legal Standard**

11        The Due Process Clause "protects the accused against conviction except upon proof

12   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

13   charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the

14   evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a

15   rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim,

16   *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas

17   relief, *see id*. at 324.

18        The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas

19   proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding

20   that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the

21   deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the

22   evidence was insufficient to support petitioner's conviction). A federal court reviewing

23   collaterally a state court conviction does not determine whether it is satisfied that the evidence

24   established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).

25   The federal court "determines only whether, 'after viewing the evidence in the light most

26   favorable to the prosecution, any rational trier of fact could have found the essential elements of

27   the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at

28   319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt

United States District Court
Northern District of California

19

1    has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

2    **Discussion**

3         The jury found true that petitioner committed the offenses for the benefit of a criminal

4 street gang, pursuant to California Penal Code section 186.22(b)(1).  Section 186.22(b)(1)

5 penalizes "any person who is convicted of a felony committed for the benefit of, at the direction

6 of, or in association with any criminal street gang, with the specific intent to promote, further, or

7 assist in any criminal conduct by gang members. . . ."  Petitioner was also found guilty of criminal

8 street gang terrorism in violation of Cal. Pen. Code § 186.22(a), which penalizes "[a]ny person

9 who actively participates in any criminal street gang with knowledge that its members engage in

10 or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or

11 assists in any felonious criminal conduct by members of that gang. . . ."

12         The California Court of Appeal set forth the relevant law and found sufficient evidence to

13 support the jury's findings:

> A. Gang Benefit Allegations
> There was ample evidence of defendant's Norteño connections and of the value to the gang of his shooting at a member of the rival Sureños.  Defendant picks at aspects of the testimony of the prosecution's gang expert, identifying some of them as irrelevant, distracting, or otherwise substantially more prejudicial than probative (Evid.Code, § 352), and essentially calling the testimony conjectural and without evidentiary support. (*See People v. Moore* (2011) 51 Cal.4th 386, 405–406, 121 Cal.Rptr.3d 280, 247 P.3d 515.)  But considering the testimony as a whole, which we must do for purposes of sufficiency-of-the-evidence analysis, even if defendant is correct about some aspects of the expert's testimony, other aspects were valuable.  The gravamen of the expert's testimony was an explanation of the Norteños' honor-based culture, their rivalry with the Sureños, and the motifs that active Norteño members use to identify themselves.  This provided valuable background for other witnesses' testimony about defendant's possession of a wide variety of Norteño paraphernalia and his admission to the sheriff's detective that he was a Norteño.  In addition, as we have noted, defendant knew Múñoz to be a Sureño, Múñoz was dressed in the blue Sureño color when defendant shot at him, and there was no obvious reason for one person to shoot at someone he barely knew on the basis defendant gave for committing this crime, i.e., that Múñoz's neighbor, who was a friend of defendant, and Múñoz did not like each other.
> B. Criminal Street Gang Terrorism Conviction
> As noted, defendant was convicted in count eight of criminal street gang terrorism in violation of subdivision (a) of section 186.22 . . . .
> . "As the statutory text indicates, the gang crime has three elements: (1) '[a]ctive participation in a criminal street gang, in the sense of

1

2

3

> participation that is more than nominal or passive,' (2) '"knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,"' and (3) 'the person "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." [Citation.]' [Citation.]"   (*People v. Mesa* (2012) 54 Cal.4th 191, 197, 142 Cal.Rptr.3d 2, 277 P.3d 743.)
> . . .
> There was sufficient evidence of the elements of the crime.  We have described the ample evidence that defendant was active in the Norteños.  Regarding the second element of the crime, defendant insists that his Norteño-related activities were not those of a full-fledged member and that there was no evidence he knew what the Norteños were about.  The evidence that defendant knew about the nature of the Norteño organization, however, comes from the array of gang paraphernalia he possessed, his prior probation condition to avoid gangs, and, most stark of all, his willingness to shoot at a Sureño for no good reason.  Regarding the third element, the gang expert's testimony sufficed to establish that defendant shot in the direction of Múñoz and Flores to promote the Norteños' interests.

4

5

6

7

8

9

10

*Jasso*, at 1376-78 (footnote omitted).

11

Petitioner is not entitled to habeas relief because he has not shown that the California Court

12

of Appeal unreasonably applied Supreme Court authority in denying this claim.  There was

13

sufficient evidence for any rational juror to find the essential elements of the crime and the

14

enhancements beyond a reasonable doubt.  The gang expert testified about the nature of the gang

15

rivalry between the Norteños and the Sureños and how shooting at a rival gang member is part of

16

the gang culture.  There was also sufficient evidence that plaintiff was associated with the gang.

17

Plaintiff even testified that he was involved with the gang from the ages of fourteen to seventeen,

18

but not when the incident occurred when he was eighteen years old.  RT at 2202-03.  Despite

19

plaintiff's arguments to the contrary, there was sufficient evidence for the jury to believe that

20

petitioner was still involved with the gang.  Petitioner also testified that he believed one of the

21

victims who was shot at, was part of the rival gang.  RT at 2226.  The California Court of

22

Appeal's denial of this claim was not an unreasonable application of *Jackson*, therefore this claim

23

is denied.[2]

24

25

26

27

28

---

[2] Petitioner is not entitled to an evidentiary hearing in this case.  Petitioner has not alleged any material fact, which he did not have a full and fair opportunity to develop in state court, and which, if proved, would show petitioner's entitlement to habeas relief.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (scope of record for 28 U.S.C. § 2254(d)(1) inquiry limited to record that was before state court that adjudicated claim on the merits).

### III.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id*. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED**.

Dated: October 14, 2015

_____
JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALEXANDER JAVIER JASSO,

          Plaintiff,

     v.

GREG LEWIS,

          Defendant.

Case No.  14-cv-00802-JD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 14, 2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Alexander Javier Jasso ID: AH-8635
Pelican Bay State Prison
PO Box 7500
Crescent City, CA 95531

Dated: October 14, 2015

Susan Y. Soong
Clerk, United States District Court

By: LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

23